1

2

3

4

5

6

7

8

9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10   PETER FUGAWA,                                    Case No. 1:11-cv-00966-LJO-SKO (PC)

11              Plaintiff,                            FINDINGS AND RECOMMENDATIONS
                                                      RECOMMENDING PLAINTIFF'S MOTION
12        v.                                          FOR LEAVE TO FILE DECLARATION BE
                                                      GRANTED, DEFENDANT'S MOTION TO
13   ROBERT TRIMBLE, et al.,                          STRIKE TWO DECLARATIONS BE
                                                      GRANTED, AND DEFENDANT'S MOTION
14              Defendants.                           FOR SUMMARY JUDGMENT BE
                                                      GRANTED
15
                                                      (Docs. 38, 51, and 52)
16
                                                      OBJECTION DEADLINE: FOURTEEN DAYS
17                                                    RESPONSE DEADLINE: FOURTEEN DAYS

18   _____/

19   **I.        Procedural Background**

20          Plaintiff Peter Fugawa ("Plaintiff"), a state prisoner proceeding pro se, filed this civil rights

21   action pursuant to 42 U.S.C. § 1983 on June 13, 2011.  (Doc. 1.)  Plaintiff is now represented by

22   counsel.  (Doc. 27.)   This action for damages is proceeding against Defendant L. DeArmond

23   ("Defendant") for use of excessive physical force, in violating of the Eighth Amendment of the

24   United States Constitution, and for battery and negligence under California law.  28 U.S.C. §

25   1915A.  (Docs. 11, 14.)  Plaintiff's claims arise out of a physical altercation at Pleasant Valley

26   State Prison ("PVSP") on January 21, 2011.

27          On July 11, 2014, Defendant filed a motion for summary judgment.  (Docs. 38, 39.)  After

28   obtaining several extensions of time, Plaintiff filed an opposition on September 22, 2014, and,

with leave of court, a supporting witness declaration on October 3, 2014.  (Docs. 40, 42, 43, 46-50.)  Also on October 3, 2014, Plaintiff filed a request for leave to replace the declarations he filed on September 22, 2014.  (Doc. 51.)  On October 10, 2014, Defendant filed a reply and a motion to strike two declarations Plaintiff filed on September 22, 2014, in support of his opposition.  (Doc. 52.)  On October 21, 2014, Plaintiff filed his declaration, submitted in replacement of the two declarations he filed with his opposition.  (Doc. 53.)

The motions have been submitted upon the record without oral argument pursuant to Local Rule 230(*l*).

## II.   **Summary Judgment Standard**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a) (quotation marks omitted); *Washington Mut. Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, although it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he need only prove an absence of evidence to support Plaintiff's case.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendant meets his initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle Corp.*, 627 F.3d at 387 (citing *Celotex Corp.*, 477 U.S. at 323).  This requires Plaintiff to "show

1  more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby,*

2  *Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

3       However, in judging the evidence at the summary judgment stage, the Court may not make

4  credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless, Inc.*, 509

5  F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

6  inferences in the light most favorable to the nonmoving party and determine whether a genuine

7  issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v.*

8  *City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

9  The Court determines only whether there is a genuine issue for trial.  *Thomas v. Ponder*, 611 F.3d

10  1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

11  **III.**   **Discussion**

12      **A.**      **Defendant's Motion to Strike Declarations and Plaintiff's Motion to Substitute**
               **Declaration**

13

14       In support of his opposition, Plaintiff submitted two declarations signed on his behalf by

15  Michael Fugawa, who purports to be his power of attorney.  (Docs. 47-3, 47-6.)  Defendant

16  objected and moved to strike the declarations on the grounds that they were not signed by Plaintiff

17  under penalty of perjury, there is no evidence Plaintiff's brother has personal knowledge of the

18  matters attested to or is authorized to act as Plaintiff's power of attorney, and Plaintiff provided no

19  authority for the proposition that his brother can sign the declarations on his behalf as a power of

20  attorney.  Plaintiff subsequently submitted a declaration with his own signature on October 21,

21  2014.

22       "Declarations must be made with personal knowledge; declarations not based on personal

23  knowledge are inadmissible and cannot raise a genuine issue of material fact." *Hexcel Corp. v.*

24  *Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (citing *Skillsky v. Lucky Store, Inc.*, 893

25  F.2d 1088, 1091 (9th Cir. 1990) and Fed. R. Civ. P. 56(c)(4)).  In as much as the events at issue

26  occurred in prison, it cannot be reasonably inferred that Plaintiff's brother has personal knowledge

27  of the matters attested to and notwithstanding the issue raised regarding validity of the power of

28  attorney, the Court is unaware of any authority, nor has Plaintiff provided any, for the proposition

1  that a declaration such as this is valid when signed by a person with power of attorney.

2  Accordingly, the Court recommends that Defendant's motion to strike the two declarations signed

3  by Plaintiff's brother be granted.

4        With respect to the declaration signed by Plaintiff on October 14, 2014, and filed on

5  October 21, 2014, Defendant did not object to Plaintiff's request for leave to file the declaration

6  and the Court can discern no actual prejudice to Defendant.  Accordingly, Plaintiff's request for

7  leave to file the replacement declaration with his own signature is granted.

8        **B.**     **Excessive Force Claim**

9             **1.**     **Undisputed Facts**

10       Plaintiff is an inmate currently incarcerated at Folsom State Prison.  On January 21, 2011,

11  Plaintiff was transported from Ironwood State Prison to PVSP in a bus with other inmates.  When

12  Plaintiff arrived at PVSP, he was escorted to a building called Receiving and Release ("R&R").

13  Plaintiff was interviewed by a lieutenant and two other officers in an office in R&R during an

14  initial housing classification screening.  The officers asked Plaintiff a series of questions during

15  the initial housing classification screening, including whether Plaintiff had any enemies, whether

16  he affiliated with any prison gangs, and with whom he felt he could be celled.  Later that day,

17  Plaintiff was assigned to cell 128 in B5 (B yard, Building 5), and he was escorted from R&R to

18  B5.  Defendant saw Plaintiff come into B5 with a Search and Escort ("S&E") Officer around 8:30

19  p.m.

20       After Plaintiff learned that he was assigned to cell 128 in B5, he approached that cell and

21  had a brief conversation with the inmate who was going to be his cellmate.  An incompatibility

22  issue arose, and Plaintiff subsequently informed inmate Radar, a clerk inside B5, of the issue.

23  After speaking with inmate Radar, Plaintiff told Defendant on two separate occasions that he

24  could not be in cell 128 because he was not compatible as a cellmate with the inmate already

25  assigned to that cell.  Plaintiff told Defendant that he could not "be housed with a Black inmate,

26  another race," and that he could not be housed in cell 128 because he feared for his safety if he had

27  to be assigned to a cell with a Black inmate.

28

4

1    Defendant ordered Plaintiff to cell 128, but Plaintiff did not comply.  Defendant called his
2    supervisor, Sergeant Amezcua, to discuss how to handle Plaintiff's refusal to go to his assigned
3    cell.

4    Plaintiff maintained he could not go into his cell because his cellmate was not Asian, but
5    he complied with Defendant's order to turn around and cuff up.  Defendant placed Plaintiff in
6    handcuffs with his hands behind his back, and Defendant asked his partner, Officer Wallace, to
7    assist with escorting Plaintiff to his cell.  When Plaintiff was about fifteen feet away from his cell,
8    he tried to keep his feet from moving so that Defendant and Officer Wallace could not lead him to
9    his cell.

10    Plaintiff was brought to the ground and Defendant then pressed his personal alarm device.
11   Defendant did not use any force on Plaintiff after he was on the ground.  Officers responded to
12   Defendant's alarm, and Officer Thatcher escorted Plaintiff out of the building.  Plaintiff did not
13   have any more contact with Defendant on January 21, 2011, after he was escorted out of B5.

14    After Plaintiff was housed in a different building, Nurse Cardens came to his cell at
15   approximately 9:45 p.m.  Plaintiff complained to Nurse Cardens that his back hurt, but he did not
16   complain of pain in his head, face, knees, shoulders, wrists, or any other area of his body.

17              **2.    <u>Defendant's Version of Events</u>**

18    Defendant denies using excessive force against Plaintiff and he argues that he used the
19   minimal amount of force necessary to address Plaintiff's physical resistance to his order,
20   resistance he perceived as a sign of aggression.  Defendant contends that after Plaintiff was
21   interviewed in R&R, he arrived at B5 with approximately six other inmates around 8:30 p.m.
22   Defendant and Officer Wallace were the B5 floor officers, and they were inside the building
23   telling the arriving inmates to which cells they had been assigned.  The S&E Officer brought
24   Plaintiff over to where Defendant was standing at the B5 podium, handed Defendant the
25   paperwork for assigning Plaintiff to B5, and left the building.  Defendant reviewed the paperwork
26   the S&E Officer handed him and informed Plaintiff of his cell assignment.

27    After approaching cell 128 and briefly speaking with the inmate inside, Plaintiff decided
28   that they were not compatible because his cellmate was Black and Plaintiff was Asian.  After

speaking with the inmate in cell 128, Plaintiff told inmate Radar, a clerk inside B5, that he had an issue with his housing assignment.  Plaintiff then told Defendant twice that he was incompatible with the inmate in cell 128; and he told Defendant that he could not be celled with a Black inmate and he feared for his safety if celled with a Black inmate.  Defendant informed Plaintiff that he and his cellmate were both designated as "Others," and ordered Plaintiff to go to his assigned cell. Plaintiff did not comply with Defendant's order, and Defendant called his supervisor, Sergeant Amezcua, to discuss how to handle Plaintiff's refusal to go to his assigned cell.  Defendant spoke with Sergeant Amezcua outside of B5.  Sergeant Amezcua told Defendant that Plaintiff's cell assignment was appropriate, as Plaintiff and his cellmate were designated as "Others;" and Sergeant Amezcua instructed Defendant to escort Plaintiff to his cell.

Defendant went back into B5 after speaking with Sergeant Amezcua and ordered Plaintiff to go to his assigned cell.  Plaintiff again said he could not go into his cell because his cellmate was not Asian, and Defendant asked him whether he would be okay with spending one night in his assigned cell while officers looked into assigning him to a different cell.  Plaintiff told Defendant that the other Asians in the building might look down on him for sharing the cell with a Black inmate.  Defendant then spoke to a few Asian inmates in B5 and they told him that they were fine with Plaintiff being in the cell with a Black inmate while officers looked into assigning Plaintiff to a different cell.

Defendant returned to the podium and ordered Plaintiff to go to his assigned cell, but Plaintiff did not comply.  When Plaintiff refused to comply with Defendant's order to go to cell 128, Defendant ordered Plaintiff to turn around and place his hands behind his back so Defendant could place him in handcuffs.  Plaintiff complied and was handcuffed; and Defendant asked Officer Wallace, his partner, to assist with the escort.  Before attempting to escort Plaintiff, Defendant instructed him to face forward and walk straight ahead.  Defendant also warned Plaintiff that if he turned or struggled during the escort, that would be taken as a sign of aggression which would compel Defendant and Officer Wallace to take Plaintiff down to the ground. Defendant denies telling Plaintiff he would slam his head into the floor if he did not walk to his cell, as Plaintiff alleges.

1    Defendant and Officer Wallace proceeded to escort Plaintiff to his assigned cell.

2  Defendant was on Plaintiff's left side, holding his left arm, and Officer Wallace was on Plaintiff's

3  right side, holding his right arm.  Defendant did not lift Plaintiff off of the ground in any manner

4  before, during, or after the escort; and he did not punch, kick, hit, or strike Plaintiff during the

5  escort.  When they were about fifteen feet from the cell, Plaintiff planted his feet to prevent being

6  led to the cell.  Plaintiff locked his legs, refused to walk, wiggled, turned his upper body, and

7  moved back and forth and side to side.

8    Based on the warnings Defendant had given Plaintiff before attempting to escort him,

9  Defendant perceived Plaintiff's resistive behavior as a sign of aggression toward him and his

10  partner.  Defendant and Officer Wallace maintained their grip on Plaintiff's arms as they used

11  their physical strength to push him down to his knees and lower him onto the ground on his chest.

12  Defendant denies kicking Plaintiff's legs out from under him to bring him to the ground or

13  slamming him to the ground; and he did not punch, kick, hit, or strike Plaintiff while he was

14  lowering Plaintiff to the ground.  Once Plaintiff was on the ground, Defendant pressed his

15  personal alarm.  Officers responded to the alarm and Plaintiff was escorted out of the building by

16  Officer Thatcher.  Plaintiff and Defendant did not have any further contact.

17    At approximately 9:45 p.m., Nurse Cardens examined Plaintiff and did not note that he had

18  any injuries.  Plaintiff complained that his back hurt but did not complain of pain anywhere else.

19        **3.    <u>Plaintiff's Version of Events</u>**

20    Plaintiff arrived at B5 on January 21, 2011, at approximately 8:30 p.m.  When Plaintiff

21  entered the building, Officer Villa, the control booth officer, asked for his name and ethnicity.

22  Plaintiff said he was Asian and Officer Villa told him to talk to the inmate in cell 128 because

23  there might be a problem.  Plaintiff spoke with the inmate in cell 128 and learned he was a Black

24  inmate who did not associate with Asians and he was classified as "Other" only because he was

25  Muslim.  Plaintiff informed Officer Villa that he could not be celled with the Black inmate.

26  Officer Villa said okay and made a phone call.  Plaintiff informed inmate Radar, an Asian inmate

27  who worked with the B5 officers, of the situation, and together they approached Defendant to

28  address the situation.  However, Defendant was not in the mood to reason with them and he was

disrespectful, telling Plaintiff if he did not like it, he would have to "take off" on the inmate, which meant fight the inmate.

Inmate Radar went to talk to Officer Villa while Plaintiff went to talk to another Asian inmate who had flagged him over. The inmate and his cellmate asked Plaintiff his affiliation and when he told them he was Asian, they told him the inmate in cell 128 was not a homie, meaning he was not affiliated with Asians.

Inmate Radar came back over and told Plaintiff that Officer Villa was working on finding Plaintiff a cell with an Asian inmate and would address the issue with Defendant and Officer Wallace. By then, it was getting close to time for the institutional count before the end of the shift and Defendant became impatient, grabbing Plaintiff's property and placing it in front of cell 128. Defendant approached Plaintiff where he was sitting, told Plaintiff to lock it up, and pointed to cell 128. Plaintiff refused and said they were not compatible. Defendant then told Plaintiff he was going to ad-seg (administrative segregation); took out handcuffs; and told Plaintiff to stand up, turn around, and place his hands behind his back. Plaintiff complied.

At the time, Plaintiff was wearing see-through fabric boxers and a jumpsuit, tennis shoes, and eyeglasses. With Plaintiff's hands cuffed behind his back, Defendant grabbed his left arm and wrist, and twisted his left wrist, lifting him up and pushing him toward cell 128. Plaintiff was shocked, as he thought he was going to ad-seg. Officer Wallace was to Plaintiff's right, with his hands on Plaintiff's right arm and wrist. Plaintiff tried to keep his feet planted to prevent himself from being moved forward, as he feared for his safety. Plaintiff asked Defendant to speak with a sergeant but Defendant ignored him and continued to apply force to his left arm and wrist, lifting and pushing him forward. Defendant then threatened Plaintiff by saying, "I'm going to slam your face into the ground if you don't go into that cell." Officer Wallace said, "That's not necessary." Defendant then twisted Plaintiff's left wrist really hard, raised him on his tiptoes, and pushed him forward while kicking his legs from beneath him, in an attempt to slam his face/head into the ground. Plaintiff was able to put his left knee in front of his body to absorb most of the impact with his knee as the side of his face/head hit the ground. Plaintiff perceived that Officer Wallace was trying to slow down the impact of Plaintiff's body hitting the ground, which caused his left

1   side to absorb most of the impact.   Once Plaintiff was on the ground, Defendant sounded his

2   personal alarm.

3       After officers arrived and assessed the situation, Plaintiff was escorted to the program

4   office by Officer Thatcher.   After Plaintiff was placed in a cage, Officer Thatcher said

5   sarcastically, "Welcome to Pleasant Valley."   Plaintiff's handcuffs were removed and soon after,

6   he began feeling tightness and pain in his lower back and right leg, causing him to squat down.

7       Plaintiff was subsequently escorted without restraints to Building 3 and housed in cell 114

8   with inmate Phillips, another Asian inmate.   Cardens, a licensed vocational nurse, arrived and tried

9   to examine Plaintiff through the narrow cell window.   Plaintiff complained that his back hurt.

10      Later on, Plaintiff felt his back stinging and pain set in all over his body while he was

11  taking a bird bath in the cell sink.   Plaintiff's cellmate saw that he had deep scratches from his

12  lower back to his middle back, probably from the handcuffs.   The next day, Plaintiff's body ached,

13  his lower back throbbed, he had shooting pain down his right leg, his wrists were swollen, and his

14  left knee was bruised and swollen.

15                    **4.    Legal Standard**

16      The Cruel and Unusual Punishments Clause of the Eighth Amendment protects prisoners

17  from the use of excessive physical force.   *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S.Ct. 1175

18  (2010) (per curiam); *Hudson v. McMillian*, 503 U.S. 1, 8-9, 112 S.Ct. 995 (1992).   What is

19  necessary to show sufficient harm under the Eighth Amendment depends upon the claim at issue,

20  with the objective component being contextual and responsive to contemporary standards of

21  decency.   *Hudson*, 503 U.S. at 8 (quotation marks and citations omitted).   For excessive force

22  claims, the core judicial inquiry is whether the force was applied in a good-faith effort to maintain

23  or restore discipline, or maliciously and sadistically to cause harm.   *Wilkins*, 559 U.S. at 37 (citing

24  *Hudson*, 503 U.S. at 7) (quotation marks omitted).

25      Not every malevolent touch by a prison guard gives rise to a federal cause of action.

26  *Wilkins*, 559 U.S. at 37 (citing *Hudson*, 503 U.S. at 9) (quotation marks omitted).   Necessarily

27  excluded from constitutional recognition is the *de minimis* use of physical force, provided that the

28  use of force is not of a sort repugnant to the conscience of mankind.   *Wilkins*, 559 U.S. at 37-8,

9

130 S.Ct. at 1178 (citing *Hudson*, 503 U.S. at 9-10) (quotations marks omitted).  In determining whether the use of force was wanton and unnecessary, courts may evaluate the extent of the prisoner's injury, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.  *Hudson*, 503 U.S. at 7 (quotation marks and citations omitted).

While the absence of a serious injury is relevant to the Eighth Amendment inquiry, it does not end it.  *Hudson*, 503 U.S. at 7.  The malicious and sadistic use of force to cause harm always violates contemporary standards of decency.  *Wilkins*, 559 U.S. at 37 (citing *Hudson*, 503 U.S. at 9) (quotation marks omitted).  Thus, it is the use of force rather than the resulting injury which ultimately counts.  *Id.* at 37-8.

### 5.  **Findings**

#### a.  **Events of January 21, 2011**[1]

In determining whether Defendant used excessive force against Plaintiff on January 21, 2011, the Court must credit Plaintiff's version of events.  *Furnace v. Sullivan*, 705 F.3d 1021, 1026-27 (9th Cir. 2013).  "'Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.'"  *Furnace*, 705 F.3d at 1026 (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).

Inmates at PVSP were classified, broadly, as Black, White, Hispanic, or Other.  Plaintiff is Asian and is classified as "Other," while the Black inmate in cell 128 was classified as "Other" because he is Muslim.  After Plaintiff arrived from R&R, Officer Villa, who was in the control booth, recognized the potential incompatibility and advised Plaintiff to speak with the inmate in cell 128, to which Plaintiff had been assigned.  Plaintiff spoke with the Black inmate in cell 128, and they determined they were not compatible as cellmates, as the Black inmate did not associate

---

[1] In addition to Plaintiff's declaration, the Court has considered portions of his deposition transcript and his verified pro se complaint. *Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004); *Carmen*, 237 F.3d at 1031.  (Docs. 11, 39, 53-1.)

1  with Asian inmates.  Plaintiff informed Defendant Villa, who told him to tell the floor officers.

2  Plaintiff then informed the Asian inmate clerk, Radar, and Defendant of the incompatibility.  In

3  response, Defendant, who was growing impatient because time for the end-of-shift institutional

4  count was approaching, told Plaintiff that was too bad and he would just have to "take off" on the

5  Black inmate, meaning fight him.  Plaintiff told Defendant at least twice that he was not

6  compatible with the inmate in cell 128, but Defendant ordered him to go to cell 128.  Plaintiff did

7  not comply with the order because he feared for his safety.

8        Defendant then ordered him to turn around and place his hands behind his back so

9  Defendant could take him to ad-seg.  Plaintiff complied, was handcuffed, and led toward cell 128.

10  Realizing he was not being taken to ad-seg, Plaintiff planted his feet in an attempt to keep from

11  being moved forward.  Defendant warned Plaintiff that if he did not walk to the cell, Defendant

12  would slam his head into the floor.  Officer Wallace, who was on Plaintiff's right side assisting

13  with the escort, said that was not necessary.  Defendant then twisted Plaintiff's left wrist hard,

14  raised him up on his tiptoes, and kicked Plaintiff's legs out from under him from the front,

15  slamming Plaintiff to the floor.  Officer Wallace appeared to try and slow the force of the impact

16  while Plaintiff brought his left knee up, which absorbed most of the impact.  However, Plaintiff's

17  upper body and head hit the ground as he landed.  Defendant then activated his personal alarm.

18  No force was used once Plaintiff was brought to the ground and the incident between Plaintiff and

19  Defendant was over.  Plaintiff was subsequently celled with an Asian inmate in another building.

20        Plaintiff sustained some cuts on his back, possibly from the handcuffs, and bruising.

21  Plaintiff also experienced pain in his lower back and right leg, and he contends he continues to

22  suffer pain from the incident.

23        **b.    <u>Application of *Hudson* Factors</u>**

24        "Prisons, by definition, are places of involuntary confinement of persons who have a

25  demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have

26  necessarily shown a lapse in ability to control and conform their behavior to the legitimate

27  standards of society by the normal impulses of self-restraint; they have shown an inability to

28  regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights

1    of others.  Even a partial survey of the statistics on violent crime in our Nation's prisons illustrates

2    the magnitude of the problem."  *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194 (1984).  It

3    is in this context that the Court must determine whether the abrupt front leg sweep executed by

4    Defendant on January 21, 2011, in response to Plaintiff's resistance to being escorted to cell 128

5    crossed the line and constituted excessive physical force, in violation of the Eighth Amendment.

6        Turning to the *Hudson* factors, Plaintiff's evidence demonstrates the existence of injuries

7    which were mostly minor.[2]  Plaintiff did not suffer any broken bones or bleeding gashes or cuts.

8    Plaintiff's leg knee took the force of the fall and he contends he sustained deep scratches to his

9    back, likely from the handcuffs scraping his back through his transparent transportation jumpsuit.

10   Plaintiff initially had back, left knee, shoulder, wrist and face pain, but he testified at his

11   deposition that the pain from his injuries subsided in the short term.  (Fugawa Depo., 43:4-45:9.)

12   Ultimately, it was his back pain that lingered.  Plaintiff contends that the fall strained his back and

13   exacerbated a pre-existing injury, and as a result, he continues to need pain medication and he is

14   limited to lifting no more than twenty-five pounds.

15       Regarding the need for the application of force, there is no dispute that Plaintiff did not

16   comply with the order to go to cell 128 and he planted his feet in an effort to impede the escort to

17   the cell.   Plaintiff's refusal to cooperate is not without explanation, but prison is not an

18   environment in which inmates have discretion with respect to obeying officers' orders.

19   Negotiation between inmates and officers regarding direct orders is not compatible with

20   incarceration, and here, Plaintiff did not comply with Defendant's order to cell up and he planted

21   his feet in an effort to resist the escort.  Although Plaintiff was restrained by handcuffs and there is

22

23   [2] Defendant objected to Plaintiff's statements regarding his injuries. Although Plaintiff is not qualified to render an
     expert medical opinion and he did not offer any expert evidence on his injuries, lay witnesses are qualified to testify
24   regarding matters rationally based on their perception. Fed. R. Evid. 701, 702.  This reasonably includes observations
     regarding pain or other symptoms felt, the presence of cuts observed, and potentially the observation that a preexisting
25   back condition was worse after an incident in which the back was strained. Fed. R. Evid. 701.  In addition, the Court
     is mindful that "[a]t summary judgment, a party does not necessarily have to produce evidence in a form that would be
26   admissible at trial." *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (citing *Block v. City of Los
     Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001)) (internal quotations omitted).  The focus is on the admissibility of the
27   evidence's contents, not its form. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004);
     *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Cheeks v. General Dynamics*, 22 F.Supp.3d 1015, 1027
28   (D.Ariz. 2014); *Burch v. Regents of Univ. of California*, 433 F.Supp.2d 1110, 1122 (E.D.Cal. 2006).

no evidence he was otherwise displaying anger or lashing out, he had refused orders while unrestrained and he was resisting the restrained escort, behavior which in fact led to prison disciplinary charges and a finding of guilt for "resistive inmate necessitating the use of force."[3] (Doc. 53, Fugawa Dec., Pl Ex. B038.)  Under these circumstances and in prison, some amount of minimal force to gain compliance was justifiable.

The force employed was a wrist twist, slight lift upward, and front leg sweep, swiftly executed to bring Plaintiff to the ground when he resisted the escort.  No other force was employed after the take down, and under these circumstances, the amount of force used was minimal and brief.

Regarding the threat reasonably perceived, Plaintiff had just arrived at PVSP and he and Defendant were not familiar with one another.  While uncuffed, Plaintiff refused Defendant's orders to go to cell 128.  Once Plaintiff submitted to handcuffs, which he did in full compliance, he resisted the escort.  Plaintiff was not mouthing off and accepting his version of events, his resistance was limited to trying to plant his feet to prevent the officers from walking him to the cell.  Defendant attested that he viewed Plaintiff's resistance as a sign of aggression and even though Plaintiff's resistance was limited to planting his feet, context remains important.  Prison is not a utopia; officers are often required to make split second decisions necessary to maintain order and discipline, and inmates are necessarily required to comply with orders.  The law does not require officers to wait for their concern over an inmate's potential aggression to come to fruition before acting to prevent a possible situation from escalating into an actual situation.  Here, the evidence viewed in the light most favorable to Plaintiff suggests he presented only a minimal threat but it remains a fact that he previously disobeyed a direct order several times and then once handcuffed, he resisted an escort.  These circumstances indicate the existence of some threat to order, even if only minimal.

Finally, as previously discussed, the take down occurred swiftly.  Even though other options may have been available to Defendant to address the situation, the undisputed facts

---

[3] Plaintiff lost time credits as a result of the disciplinary hearing determination, but the argument that his excessive force, battery, and negligence claims are barred by the favorable termination rule is not before the Court.  *Wilkinson v. Dotson*, 544 U.S. 74, 81-2, 125 S.Ct. 1242, 1248 (2005).

1  support the finding of a tempered use of force.  No weapons or chemical agents were employed,

2  and once Plaintiff was brought to the ground by the leg sweep, no further force was used against

3  him.    Accordingly, the Court finds that there was no exaggerated use of force under the

4  circumstances.

5                                   **c.    Conclusion**

6          As set forth above, not every malevolent touch by a prison guard gives rise to a federal

7  cause of action, and *de minimis* uses of force are excluded from constitutional recognition so long

8  as the use of force is not of a sort repugnant to mankind.  *Hudson*, 503 U.S. at 9-10 (quotation

9  marks omitted).  Here, with the benefit of hindsight and "in the peace of a judge's chambers," it

10 appears that Plaintiff did not present any significant threat to officers and that Defendant had other

11 options, possibly including resolution without physical force.  *Johnson v. Glick*, 481 F.2d 1028,

12 1033 (2d. Cir. 1973) (*overruled in part on other grounds*, *Graham v. Connor*, 490 U.S. 386, 392-

13 99, 109 S.Ct. 1865 (1989)).  Nevertheless, the Court finds that the use of force was *de minimis* as a

14 matter of law and that it was not employed maliciously and sadistically for the very purpose of

15 causing harm.  *Hudson*, 503 U.S. at 9-10.

16         Plaintiff refused to comply with Defendant's orders to go to cell 128 several times and

17 once handcuffed, he resisted being escorted to cell 128.  While Plaintiff's resistance was not

18 without an explanation, prison officials simply cannot maintain order and discipline in the absence

19 of inmate compliance with lawful orders, and recalcitrance in the face of orders cannot be

20 condoned.  Although the threat appears to have been minimal, refusal to obey orders and to submit

21 to an escort may nevertheless be reasonably perceived as a threat to institutional safety and

22 security, and under the circumstances, the swift execution of the front leg sweep and drop

23 constituted a *de minimis* use of force which immediately brought the situation to an end, without

24 any further incident.  That Plaintiff's preexisting back condition may have been aggravated by the

25 leg sweep and drop and/or that it may have caused some deterioration in his back condition does

26 not alter the *de minimis* nature of the force used on January 21, 2011.  While the situation might

27 arguably lend itself to sympathetic interpretation through the lens of hindsight, it did not rise to the

28

level of an Eighth Amendment violation.  Accordingly, the Court finds that Defendant is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment excessive force claim.

### d.   **Qualified Immunity**

Although it is unnecessary for the Court to reach Defendant's qualified immunity argument in light of its finding that Defendant did not violate Plaintiff's Eighth Amendment rights, it will do so in the event that determination is rejected.  Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendant's conduct violated a constitutional right, and if so, whether the right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001); *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).  While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances, and here it proceeds directly to the second step.  *Pearson*, 555 U.S. at 236 (overruling holding in *Saucier* that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); *Mueller*, 576 F.3d at 993-94.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508 (2002).  While the reasonableness inquiry may not be undertaken as a broad, general proposition, neither is official action entitled to protection "unless the very action in question has previously been held unlawful."  *Hope*, 536 U. S. at 739.

1   "Specificity only requires that the unlawfulness be apparent under preexisting law," *Clement v.*

2   *Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on

3   notice that their conduct violates established law even in novel factual circumstances," *Hope*, 536

4   U.S. at 741.

5           The existence of material factual disputes does not necessarily preclude a finding of

6   qualified immunity.  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1053 (9th Cir. 2002).

7   "Qualified immunity gives government officials breathing room to make reasonable but mistaken

8   judgments about open legal questions," *Ashcroft v. al-Kidd*, __ U.S. __, __, 131 S.Ct. 2074, 2085

9   (2011).   Here, the parties' versions of events differ in some respects, but accepting Plaintiff's

10  version of events as true, a reasonable officer could have believed that a swift leg sweep to take

11  down an inmate hindering an escort was lawful.  Officers are permitted to use to reasonable force

12  in the execution of their duties, including gaining compliance with an order, Cal. Code Regs, tit.

13  15, § 3268(a)(1), and even assuming Defendant did not, as Plaintiff alleges, give a verbal warning

14  before employing an immediate use of force, tit. 15, § 3268(h), Defendant would not have been on

15  notice that the law precluded him from employing a brief, tempered measure of physical force in

16  the face of an inmate's noncompliance with an escort under restraint that was preceded by the

17  inmate's non-compliance with orders, *see Hudson*, 503 U.S. at 4 (force used was not *de minimis*

18  where guard punched handcuffed, shackled inmate in the mouth, eye, chest, and stomach, causing

19  bruising and swelling to his face, lips, and mouth, and loosening several teeth and cracking his

20  partial dental plate); *Furnace*, 705 F.3d at 1030 (officers not entitled to qualified immunity where

21  a significant amount of force in the form of extensive pepper spray was used without significant

22  provocation or warning); *Grant v. Palomares*, No. 2:11-cv-2302 KJM KJN P, 2014 WL 466251,

23  at *14-17 (E.D.Cal. Feb. 5, 2014) (force not excessive where officer handcuffed inmate and pulled

24  his elbow back while pushing his torso forward in order to slam him into prone position from

25  seated position after inmate failed to obey orders to quiet down and take a prone position),

26  *adopted in full*, 2014 WL 2155233 (E.D.Cal. Apr. 9, 2014); *Solano v. Davis*, No. CV 13-01164-

27  ODW (DFM), 2014 WL 6473651, at *3, 9-10 (C.D.Cal. Nov. 17, 2014) (officers not entitled to

28  qualified immunity where they used unjustified force against an inmate complying with  an order

1  to keep his hands on the wall - officers placed compliant inmate in a chokehold and took him to

2  the ground; two officers each took one wrist and pulled upward while one of them kept a knee on

3  the inmate's head; a third officer pushed on the inmate's legs; and a fourth officer jumped on the

4  inmate's back, which led the inmate to yell in pain and experience severe stomach and testicle

5  pain after there was a popping noise in his groin).  Therefore, Defendant is entitled to qualified

6  immunity.

7          **C.**     **State Law Battery and Negligence Claims**[4]

8                  **1.**     **Civil Battery**

9          For civil battery, a plaintiff must show that "(1) the defendant intentionally did an act that

10 resulted in harmful or offensive contact with the plaintiff's person; (2) the plaintiff did not consent

11 to the contact; and (3) the contact caused injury, damage, loss, or harm to the plaintiff." *Tekle v.*

12 *U.S.,* 511 F.3d 839, 855 (9th Cir. 2007) (citing *Cole v. Doe 1 thru 2 Officers of Emeryville Police*

13 *Dep't*, 387 F.Supp.2d 1084, 1101 (N.D.Cal. 2005)).   In cases such as this involving a peace

14 officer, a plaintiff must also show that the defendant officer used excessive force.  *Bergman v.*

15 *Cnty. of Kern*, No. 1:14-cv-01734-JLT, 2014 WL 6473739, at *10 (E.D.Cal. 2014) (citing *Brown*

16 *v. Ransweiler*, 171 Cal.App.4th 516, 527, 89 Cal.Rptr.3d 801, 811 (Cal.Ct.App. 2009)); *Parkison*

17 *v. Butte Cnty. Sheriff's Dep't*, 2:09-cv-2257 MCE DAD P, 2013 WL 1007042, at *5 (E.D.Cal.

18 2013) (citing *Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1273, 74 Cal.Rptr.2d 614

19 (Cal.Ct.App. 1998)); *Rodriguez v. City of Fresno*, 819 F.Supp.2d 937, 952 (E.D.Cal. 2011);

20 *Garcia v. City of Merced*, 637 F.Supp.2d 731, 748 (E.D.Cal. 2008).

21          Defendant argues that the force he used was "objectively reasonable based on the facts and

22 circumstances confronting" him.   *Bailey v. Cnty. of San Joaquin*, 671 F.Supp.2d 1167, 1174

23 (E.D.Cal. 2009).  In response, Plaintiff contends that the force was inherently unnecessary and

24 unreasonable given that it was used in part in retaliation against him for exercising his right to

25 seek redress by speaking with a sergeant.

26

27

28 ──────────────
[4] Defendant withdrew his argument that Plaintiff failed to comply with the Government Claims Act.  (Doc. 52, p. 7, n.1)

1    While there is evidence that Plaintiff asked to speak to a sergeant, this action is not

2 proceeding on a retaliation claim and Plaintiff cites to no evidence supporting his assertion that

3 Defendant used physical force against him *because of* his engagement in protected conduct. *See*

4 *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) (mere speculation of retaliatory motive does not

5 suffice); *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) ("after this, therefore

6 because of this" is a logical fallacy that does not support retaliatory motive). (Doc. 53-1, Fugawa

7 Dec., ¶11.) The Court has found that the force used against Plaintiff was not excessive: it was *de*

8 *minimis* and it was not employed maliciously and sadistically for the very purpose of causing

9 harm. Accordingly, given that the force used was reasonable and not excessive, Defendant is also

10 entitled to judgment on Plaintiff's civil battery claim. *Bergman*, 2014 WL 6473739, at *10;

11 *Parkison*, 2013 WL 1007042, at *5; *Rodriguez*, 819 F.Supp.2d at 952; *Garcia*, 637 F.Supp.2d at

12 748.

13    **2.    <u>Negligence</u>**

14    Finally, "[u]nder California law, '[t]he elements of negligence are: (1) defendant's

15 obligation to conform to a certain standard of conduct for the protection of others against

16 unreasonable risks (duty); (2) failure to conform to that standard (breach of duty); (3) a reasonably

17 close connection between the defendant's conduct and resulting injuries (proximate cause); and (4)

18 actual loss (damages).'" *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (quoting *McGarry*

19 *v. Sax*, 158 Cal.App.4th 983, 994, 70 Cal.Rptr.3d 519, 530 (2008)).

20    Defendant argues that Plaintiff's refusal to comply with orders and his resistance to the

21 escort necessitated a limited use of force and under the circumstances, his conduct did not

22 constitute a breach of the duty he owed to keep Plaintiff safe. Plaintiff again contends that force

23 was inherently unnecessary and unreasonable given that it was used against him partially in

24 retaliation for exercising his right to seek redress by speaking with a sergeant.

25    The parties agree that Defendant, as a correctional officer, was "responsible for the safe

26 custody" of Plaintiff, an inmate. Cal. Code Regs., tit. 15, § 3271; *Giraldo v. California Dep't of*

27 *Corr. & Rehab.*, 168 Cal.App.4th 231, 250, 85 Cal.Rptr.3d 371, 385 (Cal.Ct.App. 2008)

28 (recognizing special relationship between jailers and prisoners); *accord Lum v. Cnty. of San*

*Joaquin*, 756 F.Supp.2d 1243, 1254-55 (E.D.Cal. 2010).   However, the finding that the use of force at issue was *de minimis* and was employed for the purpose of maintaining order rather than sadistically and maliciously for the very purpose of causing harm cannot be reconciled with a finding that in using the force, Defendant breached his duty of care to Plaintiff.   *See Davis v. City of San Jose*, __ F.3d __, __, 2014 WL 4772668, at *7 (N.D.Cal. 2014) (negligence claim arising from breach of duty by officers to refrain from using excessive force rises and falls with Fourth Amendment claim.)   Accordingly, Defendant is entitled to judgment on Plaintiff's negligence claim.

**IV.     Recommendation**

Based on the foregoing, the Court HEREBY RECOMMENDS that:

1.     Defendant's motion to strike Plaintiff's declarations signed by Plaintiff's brother, filed on October 10, 2014, be GRANTED (Doc. 52-1);

2.     Plaintiff's motion for leave to file a replacement declaration, filed on October 3, 2014, be GRANTED, nunc pro tunc to October 21, 2014 (Doc. 51); and

3.     Defendant's motion for summary judgment, filed on July 11, 2014, be (Doc. 38) GRANTED, thus concluding this action in its entirety.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).   Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.   Local Rule 304(b).   The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   Responses, if any, are due within **fourteen (14) days** from the date the objections are filed.   Local Rule 304(d).   The parties are advised that failure to file objections within the specified time may result in the waiver of

///

///

///

///

///

1  rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v.*

2  *Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

3
4  IT IS SO ORDERED.

5      Dated:   **February 17, 2015**                    **/s/ Sheila K. Oberto**
                                                  UNITED STATES MAGISTRATE JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28